United States District Court
Southern District of Texas
**ENTERED**
February 24, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| CHCA WOMAN'S HOSPITAL, LP, § <br> d/b/a THE WOMAN'S HOSPITAL OF § <br> TEXAS § <br> § <br> Plaintiff, § <br> § <br> VS. § <br> § <br> ROCKY MOUNTAIN HOSPITAL AND § <br> MEDICAL SERVICE, INC., d/b/a ANTHEM § <br> BLUE CROSS AND BLUE SHIELD, § <br> § <br> Defendant. § | CIVIL ACTION NO. H-19-3256 |

## MEMORANDUM AND OPINION

CHCA Woman's Hospital, L.P., d/b/a The Woman's Hospital of Texas, sued the Rocky Mountain Hospital and Medical Service, Inc., d/b/a Anthem Blue Cross and Blue Shield, after Anthem took back part of its payment to the Hospital for treatment provided to a newborn patient. The Hospital alleges that Anthem had approved the treatment as medically necessary and that the recoupment violated the Hospital's PPO/POS Network Participation Agreement, the Texas Insurance Code, and the Employee Retirement Income Security Act. (Docket Entry No. 1). The Hospital moved to stay and compel arbitration under the Agreement, and Anthem responded and moved to dismiss for failure to state a claim, arguing that the Hospital's claims are either ERISA-preempted or that the Hospital failed to exhaust its administrative remedies and its claims are time-barred. (Docket Entry Nos. 7, 18, 14). Both parties filed responses and replies. (Docket Entry Nos. 19, 21, 22).

Based on the pleadings, the motions and responses, the record, and the applicable law, the court denies the Hospital's motion to stay and compel arbitration and denies Anthem's motion to dismiss in part and grants it in part. The reasons for these rulings are set out in detail below.

**I.     Background**

In January 2014, a boy was delivered prematurely at the Hospital and admitted to the Hospital's neonatal intensive-care unit. (Docket Entry No. 1 at ¶ 14). After delivery, the Hospital "registered [the baby] as an Anthem Subscriber based on the health insurance information that his parents provided to the Hospital." (*Id.*). The insurance is a self-funded benefit plan sponsored by the Westmoreland Coal Company. (Docket Entry No. 18 at 3). The Hospital alleges that it notified Anthem of the baby's Hospital admission and asked Anthem for authorization and coverage verification, which it received through Anthem's agent, Ameriben Compass. (Docket Entry No. 1 at ¶ 15). The Hospital alleges that Ameriben later authorized the baby's "entire inpatient admission to the NICU." (*Id.*). The Hospital provided the baby with medical care for two months before discharging him. (*Id.* at ¶¶ 14–15).

After the baby was discharged, the Hospital submitted a payment claim to BlueCross BlueShield of Texas ("BCBSTX"), a division of the Health Care Service Corporation. (*Id.* at ¶ 16). The Hospital had entered a PPO/POS Network Participation Agreement with BCBSTX. (*Id.* at ¶ 6). Under this Agreement, the Hospital agreed to treat any patient covered under a Blue Cross Blue Shield licensed health plan, and to be reimbursed at the rates specified in the Agreement. (*Id.*). The Hospital agreed to seek reimbursement through the BlueCard Program, described in the Agreement. (Docket Entry No. 7 at 2–3). Under the Program, the Hospital submits a claim to the local Blue Cross Blue Shield licensee, which reviews the claim, determines the amount payable, and forwards the claim to the Blue Cross Blue Shield Health Plan that insures the patient. (*Id.*). The administrator for the insuring plan reviews the patient's policy, determines whether the treatment is covered, and either approves or denies payment. (*Id.* at 3–4). The local Blue Cross Blue Shield licensee communicates the insuring plan's payment decision to the Hospital. (*Id.* at 4).

The Agreement contains the following arbitration clause:

> [A]ny dispute between BCBSTX and Hospital arising out of, relating to, or involving the interpretation of, or in any other way pertaining to this Agreement or any prior Agreement between BCBSTX and Hospital shall be resolved using alternative dispute resolution mechanisms instead of litigation. BCBSTX and Hospital agree and acknowledge that it is their mutual intention that this provision be construed so broadly as to provide for mediation and/or arbitration of all disputes arising out of their relationship as third-party Payer and Hospital . . . .

(Docket Entry No. 1 at ¶ 10; Docket Entry No. 1-1). Anthem is not a signatory to the Agreement, but is the Blue Cross Blue Shield licensee for Colorado. (*Id.* at 2).

The Hospital followed the BlueCard Program procedure described above for the baby's treatment. (Docket Entry No. 1 at ¶ 16). Anthem paid the Hospital "the entire amount due under the Agreement for the care that the Hospital provided." (*Id.*). Over nine months later, Anthem electronically recouped $259,951.12, part of the earlier payment, as "Overpayment Recovery." (*Id.* at ¶ 17).

The Hospital alleges that it promptly contacted BCBSTX to ask about the recoupment. (*Id.* at ¶ 18). BCBSTX explained that Anthem had not received medical records supporting the treatment it had requested from the Hospital. (*Id.*). The Hospital alleges that it had sent Anthem the baby's medical records after submitting the claim for payment, and that it resubmitted the medical records to BCBSTX after the recoupment. (*Id.* at ¶¶ 16, 18). The Hospital alleges that it continued to ask about the claim. (*Id.* at ¶ 19). Three months later, Anthem notified the Hospital that it had determined that "certain of the dates of the Patient's NICU admission were not medically necessary, and therefore not payable under the Agreement." (*Id.*). The Hospital filed an administrative appeal of Anthem's decision on the medical necessity part of the treatment the baby received. (*Id.*).

In August 2019, the Hospital sued Anthem, asserting a state-law breach-of-contract claim and ERISA violations. (Docket Entry No. 1). The Hospital argued that the disputes were subject

3

to arbitration and separately moved to stay this litigation and compel arbitration. (Docket Entry No. 1 at ¶¶ 10–11; Docket Entry No. 7). Anthem responded that arbitration was inappropriate because it was not a party to the Agreement and, alternatively, that the Agreement does not cover the dispute. (Docket Entry No. 18 at 1–2). Anthem separately moved to dismiss the Hospital's breach-of-contract claim because of ERISA preemption and moved to dismiss the Hospital's alternative claim under ERISA because the Hospital failed to exhaust its administrative remedies and filed suit too late. (Docket Entry No. 14). The court heard oral argument on the motions. (Docket Entry No. 29). The parties' arguments are addressed below.

## II.     The Legal Standards

### A.     A Motion to Stay Litigation and Compel Arbitration

Under the Federal Arbitration Act, a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act reflects "a liberal federal policy favoring arbitration agreements," *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (citation omitted), and places arbitration agreements "upon the same footing as other contracts," *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 257 (5th Cir. 2014) (citation omitted).

Enforcing an arbitration agreement requires two threshold steps analyzed under state contract law. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). The first is contract formation, to determine whether the parties entered into "any arbitration agreement at all." *Id.* While arbitration agreements, like other contracts, may be invalidated by contract defenses like fraud, duress, unconscionability, or waiver, none applies here. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

The second step is contract interpretation, to determine whether "*this* claim is covered by the arbitration agreement." *Kubala*, 830 F.3d at 201. The Fifth Circuit has "instructed that 'a court

is required to enforce a party's commitment to arbitrate his federal statutory claims.'" *Reyna v. Int'l Bank of Commerce*, 839 F.3d 373, 378 (5th Cir. 2016) (quoting *Carter*, 362 F.3d at 297). When a plaintiff's claim falls within the scope of the arbitration clause, the case must be stayed or dismissed in favor of arbitration. *See Poole-Ward v. Affiliates for Women's Health, P.A.*, 283 F. Supp. 3d 595, 598 (S.D. Tex. 2017), *appeal dismissed and remanded*, No. 17-20630, 2017 WL 8772615 (5th Cir. Dec. 1, 2017).

  **B.** **A Motion to Dismiss**

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

The court should generally give a plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile. *See Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 232 (5th Cir. 2012); *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) ("[Rule 15(a)] evinces a bias in favor of granting leave to amend." (quotation omitted)); *Great Plains Tr. Co. v. Morgan Stanley Dean*

5

*Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). "Whether leave to amend should be granted is entrusted to the sound discretion of the district court." *Pervasive Software*, 688 F.3d at 232.

In considering a motion to dismiss for failure to state a claim, the court is to consider "the contents of the pleadings, including attachments." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Documents attached to a motion to dismiss are "considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim." *Id.* at 498–99 (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)). The court may also "take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

## III. The Hospital's Motion to Stay the Litigation and Compel Arbitration

### A. Arbitrability

As a threshold matter, the Hospital argues that the court must resolve whether the disputes are subject to arbitration before ruling on Anthem's motion to dismiss for failure to state a claim. (Docket Entry No. 19 at 6). Anthem argues that the court should review the two motions together because "if [the contract breach] claim is preempted by ERISA or cannot be pursued, . . . then there is no dispute under the Agreement to compel to arbitration." (Docket Entry No. 21 at 2).

Arbitrability is "a gateway issue" that courts must address at the outset of the litigation. *Reyna*, 839 F.3d at 376; *see also Elgohary v. Herrera*, 405 S.W.3d 785, 790 (Tex. App. – Hous. [1st Dist.] 2013, no pet.) ("While non-signatories to an arbitration agreement can be bound to arbitrate under principles of contract and agency law, such issues—dealing as they do with non-signatories—are gateway 'issues of arbitrability' that the courts are primarily responsible for deciding—not the arbitrator.")

The Hospital has asserted claims for breach of contract and for ERISA violation. (Docket Entry No. 1 at ¶¶ 24–33). "Congress did not intend to exempt statutory ERISA claims from the

6

dictates of the Arbitration Act." *Kramer v. Smith Barney*, 80 F.3d 1080, 1084 (5th Cir. 1996). If arbitration is required in this case, Anthem's arguments about the Hospital's failure to exhaust administrative remedies or file timely under ERISA are for the arbitrator, and not this court.

The Hospital argues that arbitrability is for the arbitrator to determine, citing the Agreement's provision "that any arbitration will take place pursuant to 'the commercial rules and regulations of the American Health Lawyers Association.'" (Docket Entry No. 7 at 12). These rules and regulations "empower the arbitrator to determine "his powers and duties under an arbitration clause." (*Id.*). The Hospital cite Fifth Circuit precedent discussing the effect of incorporating the American Arbitration Association rules. (*Id.*). The incorporation of the American Arbitration Association rules "presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012). While courts in this circuit have not addressed whether a similar presumption applies to the American Health Lawyers Association rules, at least one court has found that the American Health Lawyers Association language is substantially similar to the American Arbitration Association language, supporting a finding of delegation to decide arbitrability. *See Williamson v. Grano*, No. 1:18-CV-00432-WJ-SCY, 2019 WL 211684, at *5 (D.N.M. Jan. 16, 2019).

Anthem responds that the decision is for the district court as part of the gateway arbitrability analysis. (Docket Entry No. 18 at 20). "Where the very existence of any [arbitration] agreement is disputed, it is for the courts to decide at the outset whether an agreement was reached." *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 514 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 218 (5th Cir. 2003)). "While parties can select an arbitrator to determine whether their arbitration agreement is valid, courts strongly

7

presume that a judge should resolve the issue." *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 531 (5th Cir. 2019).

In *Petrobras America, Inc. v. Vicinay Cadenas, S.A.*, 921 F. Supp. 2d 685, 693 (S.D. Tex. 2013), the court noted that the plaintiff "ha[d] not expressly assented to the incorporation of the AAA Rules into an arbitration agreement" because there was no express agreement to arbitrate in the first place. "A contract that is silent on a matter cannot speak to that matter with unmistakable clarity, so an agreement silent about arbitrating claims against non-signatories does not unmistakably mandate arbitration of arbitrability in such cases." *Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 632 (Tex. 2018). The district court should determine arbitrability, when as here, the claims are against a nonsignatory to the arbitration agreement.

The threshold question of arbitrability is a question for this court and is addressed first.

### B. Direct-Benefits Estoppel

The first step in deciding a motion to compel arbitration is for the court to determine whether a valid arbitration agreement exists. Anthem argues that no arbitration agreement exists because it is not a party to the Agreement containing the arbitration clause. (Docket Entry No. 18 at 9). "[W]here a party contends that it has not signed any agreement to arbitrate, the court must first determine if there is an agreement to arbitrate before any additional dispute can be sent to arbitration." *Will-Drill*, 352 F.3d at 218. The Hospital admits that Anthem is not a signatory to the Agreement, but argues that Anthem can be compelled to arbitrate as a nonsignatory under direct-benefits estoppel. (Docket Entry No. 7 at 1).

Texas recognizes several grounds for binding a nonsignatory to an arbitration agreement, including direct-benefits estoppel. *Halliburton*, 921 F.3d at 530–31; *Jody James*, 547 S.W.3d at 637. Direct-benefits estoppel occurs "when the non-signatory knowingly exploits the contract

containing the arbitration clause and obtains a direct benefit from that contract." *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010).

Anthem argues that direct-benefits estoppel does not apply because it has not "sought to enforce the terms of the Agreement against CHCA."[1] (Docket Entry No. 18 at 10). Direct-benefits estoppel typically applies when a nonsignatory seeks to enforce an agreement against a signatory, *see Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 362 (5th Cir. 2003), but this is not the only application. The court must consider: (1) "whether the nonsignatory demanded and received substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under the contract or otherwise"; (2) "the relationship between the claims to be arbitrated and the contract"; and (3) "whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract." *Wood v. PennTex Resources, L.P.*, 458 F. Supp. 2d 355, 371 (S.D. Tex. 2006).

Applying the *Wood* factors here supports finding that direct-benefits estoppel does not apply. The first factor is "whether the nonsignatory demanded and received substantial and direct benefits under the contract containing the arbitration clause, by suing the signatory under the contract or otherwise." In *Ace American Insurance Company v. Huntsman Corporation*, 255

---

[1] Anthem argues that it did not receive any benefit from the discounted rate under the Agreement because the baby was insured by a self-funded plan, and the Plan, not Anthem, was responsible for the payment. (Docket Entry No. 18 at 13). Anthem attaches a copy of the self-funded Plan, which states that Westmoreland Coal Company is the employer and Plan administrator, and that AmeriBen is the third-party administrator for claims adjudication. (Docket Entry No. 18-1 at 147). The Plan mentions Anthem only once, as a contact for Plan members with questions about network and out-of-network service providers. (*Id.* at 13).

The Hospital replies that the proper defendant "is the party that controls administration of the plan." (Docket Entry No. 22 at 7 (quoting *LifeCare Mgmt. Servs. v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 844 (5th Cir. 2013))). The Hospital argues that it "has alleged that Anthem exercised control over the adjudication of the Hospital's claim," and offers to submit evidence in support of its factual allegations that Anthem was involved in claim administration and adjudication for this patient. (*Id.* at n.14).

At oral argument, the Hospital argued that when it submitted the claim and attempted to appeal it, it was told that AmeriBen was Anthem's agent, and that Anthem made the decision about medical necessity. (Docket Entry No. 29). Because the court finds that there is no valid agreement to arbitrate, it need not reach this issue.

F.R.D. 179, 206 (S.D. Tex. 2008), this court noted several ways in which a nonsignatory might receive direct benefits from an agreement, "such as relying on the signatories' performance of the contract containing the arbitration clause, . . . asserting that monetary compensation is owed under the contract with the arbitration clause, . . . and receiving monetary compensation flowing from obligations under the contract with the arbitration clause." Indirect benefits, by contrast, include "eliminating competition as a result of purchasing a signatory to a contract with an arbitration clause, [or] receiving benefits by acquiring a signatory to an arbitration agreement." *Id.*

*Zurich American Insurance Company v. Watts Industries, Inc.*, 417 F.3d 682, 684 (7th Cir. 2005) is instructive. In *Zurich*, an insurer issued liability insurance policies and deductible agreements to both a company and its subsidiary. *Id.* The deductible agreements had arbitration clauses, but the primary liability policies did not. *Id.* The subsidiary did not sign any of the deductible agreements, and the court noted that the subsidiary did not seek to enforce any rights under the deductible agreements. *Id.* at 688. Direct-benefits estoppel did not apply. "Even assuming that [the subsidiary] ha[d] benefitted from the deducible agreements by paying lower insurance premiums based on the deductibles, this benefit is too attenuated and indirect to force arbitration under an estoppel theory." *Id.*

The Hospital argues that Anthem received substantial and direct benefits under the Agreement by providing services to Anthem's insureds, including the baby and his parents, on the lower, in-network basis, and by the fact that its insureds were not at risk for balance billing from the Hospital. (Docket Entry No. 7 at 7–8). The Hospital notes that Anthem "approved payment to the Hospital at the rates set forth in the Agreement," and that Anthem advertises the benefits of the BlueCard Program on its website. (*Id.* at 8–9). Anthem responds that under *Zurich*, "access to lower rates as a result of the Agreement" is not a sufficiently direct benefit to bind Anthem to arbitration under the Agreement. (Docket Entry No. 18 at 14).

10

The court agrees with Anthem that its access to a lower service rate is similar to the subsidiary's access to lower insurance premiums in *Zurich*. Both represent attenuated benefits passed from a signatory to a nonsignatory. Both the Hospital and Anthem rely on this court's previous opinions in *Wood v. PennTex Resources, L.P.*, 458 F. Supp. 2d 355 (S.D. Tex. 2006), and *Ace American Insurance Company v. Huntsman Corporation*, 255 F.R.D. 179 (S.D. Tex. 2008). In *Wood*, this court concluded that the nonsignatory had received direct and substantial benefits from the agreement containing the arbitration clause, not only because the nonsignatory had received approximately $79,000 in attorneys' fees, but also because he had participated in negotiating the agreement, was named in the agreement, and had been involved in executing and performing the agreement. 458 F. Supp. 2d at 370. In *Huntsman*, the nonsignatory "directly demanded payment" of insurance proceeds from the signatory, which the court found constituted direct and substantial benefits. 255 F.R.D. at 206. In both cases, the nonsignatory did more than receive a financial benefit from a lower billed rate by a signatory to an agreement containing an arbitration clause.

The second factor, "the relationship between the claims to be arbitrated and the contract," supports the denial of direct-benefits estoppel. The Hospital alleges that Anthem wrongfully denied payment for part of the baby's treatment that Anthem initially paid but then determined was not medically necessary and recouped. (Docket Entry No. 1 at ¶¶ 14–17). Anthem responds that the dispute is about medical necessity, which is determined by the Plan. (Docket Entry No. 18 at 18). The Hospital alleges in its contract-breach claim that it provided "Medically Necessary Covered Services to Patient," a claim that "touches matters" in both the Agreement and the Plan. (Docket Entry No. 1 at ¶ 24). The Hospital alleges that under the BlueCard Program, the Plan, not the Agreement, determines the medical services allowed. (*See* Docket Entry No. 7 at 3). According to the Hospital's own account of the BlueCard Program, this litigation is not about the

11

Program, which is the subject of the Agreement, but the medical services allowed under the patient's Plan. These claims have an attenuated relationship to the Agreement, which does not support a finding of direct-benefits estoppel.

The third factor, "whether equity prevents the nonsignatory from avoiding the arbitration clause that was part of that contract," also undermines finding direct-benefits estoppel. Direct-benefits estoppel requires the nonsignatory to have "knowingly exploit[ed] the agreement containing the arbitration clause." *See Wood*, 458 F. Supp. 2d at 368 (citing *Bridas*, 345 F.3d at 362). The Hospital cites *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 135 (Tex. 2005) (internal quotation and alteration omitted), in which the Texas Supreme Court held that "when a nonparty consistently and knowingly insists that others treat it as a party, it cannot later turn its back on the portions of the contract, such as an arbitration clause, that it finds distasteful." (*See* Docket Entry No. 7 at 6).

"To satisfy the knowledge requirement, the case law requires that the non-signatory have had actual knowledge of the contract containing the arbitration clause." *Noble Drilling*, 620 F.3d at 473. "A nonsignatory must have specific knowledge of the relevant agreement—a nonsignatory's generalized sense that two contracting parties have a course of dealing will not satisfy this requirement." *Pershing, L.L.C. v. Bevis*, 606 F. App'x 754, 758 (5th Cir. 2015). In *Noble Drilling Services, Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473–4 (5th Cir. 2010), the Fifth Circuit found that Noble Drilling was not required to arbitrate its claims when Certex had not provided any evidence "that Noble knew of the terms of the" agreement with the arbitration clause, and the district court had not found that Noble had such knowledge. Relying on *Noble Drilling*, the court in *Petrobras America, Inc. v. Vicinay Cadenas, S.A.*, 921 F. Supp. 2d 685, 694 (S.D. Tex. 2013), refused to base direct-benefits estoppel on an inference that the plaintiff knew of the agreement's terms.

12

The Hospital relies on the fact that Anthem pays the rates described in the Agreement to establish that Anthem had knowledge of the Agreement. But as described by the Hospital, Anthem receives a bill from the Hospital through BCBSTX. Nothing in the BlueCard Program, as the Hospital describes it, allows an inference that Anthem had knowledge of the Agreement's terms, other than that the Hospital was a participant in the BlueCard Program. The Hospital has failed to show that Anthem knew of the Agreement's terms such that it could, and did, knowingly exploit it by demanding benefits on those terms.

No valid arbitration agreement between the parties exists. Because the court finds that direct-benefits estoppel does not apply, the court does not reach step two of the arbitration analysis.

The court denies the Hospital's motion to compel arbitration.

## IV.  Anthem's Motion to Dismiss

Anthem argues that the Hospital's claims are subject to dismissal because of ERISA preemption, or, in the alternative, because the Hospital failed to exhaust its administrative remedies. (Docket Entry No. 14 at 4).

Much of the argument relating to ERISA turns on whether the Hospital's claim is about its right to payment, *i.e.*, coverage, or about its rate of payment, *i.e.*, cost. A claim about the right to payment is ERISA-preempted; a claim about the rate of payment is not. *See Electrostim Med. Servs., Inc. v. Health Care Serv. Corp.,* 614 F. App'x 731, 738 (5th Cir. 2015).

### A.  The Breach-of-Contract Claim

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). ERISA contains two preemption provisions: § 514(a), ERISA's expansive preemption provision, and § 502(a), which may apply when § 514(a) is inapplicable. *See Woods v. Tex. Aggregates, L.L.C.*, 459 F.3d 600, 602–03 (5th Cir. 2006). These provisions "are intended to ensure that employee benefit plan regulation would

13

be exclusively a federal concern." *Davila*, 542 U.S. at 208 (internal quotation omitted). Under § 514(a), ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan[.]" 29 U.S.C. § 1144(a). "[A] state law relates to an ERISA plan if it has a connection with or reference to such a plan*.*" *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (internal quotation omitted). "[H]owever, the Supreme Court recognizes that, given its broadest reading, the phrase 'relate to' would encompass virtually all state law." *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 382 (5th Cir. 2011) (citing *Egelhoff*, 532 U.S. at 146; and *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995)). For that reason, courts are to "go beyond the unhelpful text and the frustrating difficulty of defining ['relate to'], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id*. (quoting *Travelers*, 514 U.S. at 656).

"[ERISA] preempts state law claims when an individual could have brought the claim under ERISA and there is no legal duty independent of ERISA or an ERISA plan's terms that is implicated by the defendant's actions." *S. Tex. Clinical Lab., Ltd. v. UnitedHealthcare of Texas, Inc.*, No. 2:18-CV-240, 2018 WL 8647666, at *2 (S.D. Tex. Dec. 27, 2018) (citing *Davila*, 542 U.S. at 210). Because the Hospital alleges that it was wrongly denied a payment for certain services, rather than that it was underpaid for those services, Anthem argues that the Hospital brings a right-to-payment claim that is ERISA-preempted. (Docket Entry No. 14 at 1). The Hospital responds that its claims are not ERISA-preempted because Anthem's actions implicate independent legal duties under the Agreement and Texas law. (Docket Entry No. 19 at 9).

While the Hospital argues that it brings its claim under the Agreement, its claim stems from the Plan that covered the baby and what that Plan defined as medically necessary services. In *Memorial Hermann Hospital System v. UnitedHealthcare Insurance Company*, No. CIV. A. H-

11-3545, 2012 WL 92563, at *3 (S.D. Tex. Jan. 11, 2012), this court found that "ERISA preempts the cause of action for breach of contract to the extent it is premised on [the insurance company's] determination that the medical treatment provided was not medically necessary." This claim "could have [been] brought . . . under ERISA." *See S. Tex. Clinical Lab*, 2018 WL 8647666, at *2; *see also Mem'l Hermann Health Sys. v. Coastal Drilling Co., LLC Employee Ben. Tr.*, 12 F. Supp. 3d 1001, 1011 (S.D. Tex. 2014) (a plaintiff's claim to enforce a provision of an ERISA plan through a state-law breach of contract claim would be preempted).

The Hospital relies on Chapter 1301 of the Texas Insurance Code to argue that Texas law forbids Anthem from authorizing medical care and later denying payment for that care, imposing a legal duty independent of ERISA. (Docket Entry No. 19 at 10). But Chapter 1301 does not apply to claims against an administrator of a self-funded ERISA plan. *See Health Care Serv. Corp. v. Methodist Hosps. of Dall.*, 814 F.3d 242, 248 (5th Cir. 2016) ("Chapter 1301 is not applicable to BCBSTX's activities as administrator of the self-funded plans or state government plans, nor to those activities that it performs as administrator of claims under the BlueCard program."). Texas law adds no duty separate from or independent of ERISA.

ERISA preempts the Hospital's breach-of-contract claim.

### B. The ERISA Claim

The Hospital alternatively claimed under ERISA that it is entitled to payment under the health plan that covered the baby. (Docket Entry No. 1 at ¶ 28). Anthem argues that this claim should be dismissed because the Hospital failed to exhaust its available administrative remedies before bringing suit. (Docket Entry No. 14 at 9). To the extent the Hospital has exhausted its remedies, Anthem argues that the health plan's limitations period bars the ERISA claim. (*Id.* at 10).

"[C]laimants seeking benefits from an ERISA plan must first exhaust available administrative remedies under the plan before bringing suit to recover benefits." *Gonzalez v. Aztex Advantage*, 547 F. App'x 424, 427–28 (5th Cir. 2013) (citing *Bourgeois v. Pension Plan for Emp. of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000)). "The primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo*." *Denton v. First Nat. Bank*, 765 F.2d 1295, 1300 (5th Cir. 1985). The Fifth Circuit recognizes an exception to the defense of failure to exhaust administrative remedies "when such attempts would be futile" and when the plan provides inadequate remedies. *Wilson v. Kimberly–Clark Corp.*, 254 F. App'x 280, 286 (5th Cir. 2007) (internal quotation omitted).

The Hospital argues that it exhausted the administrative remedies under the Agreement, which should be sufficient. (Docket Entry No. 19 at 14). To the extent that it was required to separately exhaust the Plan remedies, the Hospital argues that Anthem "never provided notice to the Hospital of these purportedly required appeal levels, nor did the Hospital even have access to a copy of the Patient's health plan until" this litigation began. (*Id.*). Federal regulations require the ERISA plan administrator to provide a claimant with "written or electronic notification of any adverse benefit determination," including "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review." 29 C.F.R. § 2560.503-1(g)(1)(iv). Failure to do so waives the defense of failure to exhaust. 29 C.F.R. § 2560.503-1(I)(1) ("[I]n the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have

16

exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.").

The Hospital argues that Anthem "recouped its payment without the Hospital receiving any written explanation of why" and without any notice of appeal procedures under the health plan. (Docket Entry No. 19 at 14–15). It argues that "this precludes Anthem from relying on the alleged failure to exhaust appeals in defense of this action." (*Id.* at 15).

Anthem responds that the Hospital "speaks out of both sides of its mouth" because it argues that Anthem breached the Plan covering the baby, while also arguing that the Hospital had no knowledge of the plan's terms. (Docket Entry No. 21 at 6). But Anthem does not allege that it provided the Hospital with the Plan terms, including the steps needed to appeal or exhaust under the Plan or the Plan's limitations periods. Instead, Anthem argues the Hospital does not allege that it was communicating with Anthem in a way that would trigger the notice requirement. (*Id.* at 6–7). But the Hospital does allege that it was communicating with BCBSTX, as required under the BlueCard Program, about the claim and its appeal. (*See* Docket Entry No. 1 at ¶¶ 17–19). Anthem had a duty to provide the Hospital, directly or through BCBSTX, the Plan terms, because the Hospital was a claimant.

Accepting the Hospital's allegations as true for the purposes of the motion to dismiss, the Hospital has adequately pleaded that it did not fail to exhaust the required administrative remedies and its ERISA claim survives Anthem's motion to dismiss. *See Encompass Office Sols., Inc. v. La. Health Serv. & Indem. Co.*, 919 F.3d 266, 281–82 (5th Cir.), *cert. denied sub nom. La. Health Serv. & Indem. Co. v. Encompass Office Sols.*, 140 S. Ct. 221 (2019) (not disturbing the district court's holding that without notice, contractual limitations periods do not apply).

17

## IV. Conclusion

The Hospital's motion to stay the litigation and compel arbitration, (Docket Entry No. 7), is denied. Anthem's motion to dismiss, (Docket Entry No. 14), is granted in part, for the breach-of-contract claim, and denied in part, for the ERISA violation claim.

SIGNED on February 24, 2020, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge